IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON

FILED

December 2, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

IN RE: CHAD ALAN ANDOLINO )

CHARLES ALAN MIX and LORENA )
MAY MIX, )
)
        Petitioners/Appellants, ) Decatur Chancery No. 2305
)
VS. ) Appeal No. 02A01-9510-CH-00224
)
ROBERT BARTON, )
)
        Intervening Petitioner/ )
        Appellee. )

APPEAL FROM THE CHANCERY COURT OF DECATUR COUNTY
AT DECATURVILLE, TENNESSEE
THE HONORABLE WALTON WEST, CHANCELLOR

**THOMAS F. BLOOM**
Nashville, Tennessee
Attorney for Appellants

**LEW CONNER**
**LARRY H. HAYES, JR.**
**BOULT, CUMMINGS, CONNERS & BERRY, PLC**
Nashville, Tennessee
Attorney for Appellee

**AFFIRMED AND REMANDED**

**ALAN E. HIGHERS, J.**

**CONCUR:**

**DAVID R. FARMER, J.**

**DAVID G. HAYES, J.**

      This case presents for review the decision of the Chancery Court of Decatur County

finding that the Defendant, Robert Barton ("Father") did not abandon his son, Chad Andolino ("Son") and, therefore, dismissing Plaintiffs', Charles and Lorena Mix ("Mixes"), petition for adoption. The Mixes appealed. For reasons stated hereinafter, we affirm the judgment of the trial court.

**Facts**

Barton first met the natural mother of Son, Debra Andolino ("Mother"), on Easter Sunday, April, 1991. Mother discovered she was pregnant in September, 1992. Son was born May 12, 1993. Father and Mother began living together in January, 1993, and continued to do so until March, 1993, when they separated. Mother has three daughters from previous relationships.

The parties' assertions of facts conflict in nearly every respect. The Mixes contend that Father wanted Mother to get an abortion, that Father added virtually nothing to Mother's support while they lived together, that Father never evinced any real interest in Son before or after his birth, and that Father only desires custody of Son now in order to gain a promised financial windfall from Father's mother. Father repudiates these claims and argues that his apparent lack of care for Son is solely the result of attempts by the Mixes to keep him from having any contact with Son.

Specifically, there is some dispute over Father's contributions to Mother and Son before and after Son's birth. Father contends that Mother and he compiled their money and split the bills. Mother asserts that Father made virtually no contributions to the household. Several witnesses on behalf of Mother testified that Mother paid the bills, bought food, and borrowed money from others in order to buy groceries and gas. Father supplied several receipts to prove his contributions. Father contends that these are representative of the financial contributions made by him to the household. Mother testified that many of these receipts belonged to her and not Father.

Father admits to using illegal drugs and drinking alcohol in the past, but contends that he has never drunk beer or taken any illegal drugs in front of the children and has

never encouraged the children to do so.  Additionally, Father claims that, at the present time, he does not partake of drugs, and only occasionally drinks beer.

Father admits that he did not aid with Mother's medical costs during her pregnancy, but asserts that Mother's pregnancy was covered by Medicaid.  Additionally, Father contends that he escorted Mother to the doctor several times while she was pregnant with Son.  Mother contends that Father went to the doctor on one occasion for the "selfish purpose" of verifying that Mother was pregnant and, on another occasion, to drop off Mother at the emergency room.

Father and Mother separated in March, 1993.  As Father and Mother's relationship was nearing an end, Mother contends that Father beat her daughter, Shantel, to the point that bruises were left by the beating.  Father admits only to "spanking" Shantel and denies that he left any marks on her.  As a result, Mother received a restraining order against Father, restraining him from the house.

After separating, Father made no contact with Mother and Son.  Father acknowledged this lack of contact with Mother and Son after his separation with Mother. However, Father alleged that this was because he did not understand that he was free to contact her under the restraining order.  Father and Mother did not see each other again until April, 1993, when the two met at Pizza Hut, along with Lorena Mix, Mother's friend, Jennifer Roman, and Lorena Mix's brother, Eddie.  Mother was attempting to procure Father's consent for adoption.  Father contends that he did not know why Mother called the meeting, but he thought the meeting was probably to "talk peace."  Father asserts that he had no idea that the meeting was to discuss adoption and the surrender of his parental rights.  Father did not agree to the adoption nor to the surrender his parental rights.

In April, 1993, Mother returned with Lorena Mix to Nashville, Tennessee.  Lorena Mix stayed with Mother in a Nashville hotel and was present when Mother went into labor. The Mixes were married on May 1, 1993.  Son was born on May 12, 1993, and has lived

3

with the Mixes since May 14 of that same year. Mother legally surrendered Son to the Mixes. Mother did not tell Father that she had gone to Nashville, Tennessee. Father called several hospitals to find the whereabouts of Mother. Unsuccessful in his attempts to locate Mother, Father hired an attorney and a private investigator to find Mother and possibly their newborn child. The private investigator located Mother and Son and informed Father of their whereabouts.

After Son's birth, Mother saw Father in June, 1993. Father asked Mother about Son's sex, name, and health. Mother alleges that Father made no further inquiry about Son, and did not offer payment of support, nor payment of any hospital bills as a result of the birth of Son. That same month, Mother started dating Father again. Mother asserts that, in this time, Father never asked about Son. The relationship ended when Mother discovered that the Mixes had been served with court papers on behalf of Father.

On June 3, 1993, the Mixes filed a petition for the adoption of Son. Father filed a petition to intervene and a motion to dismiss petition for adoption on November 23, 1993. On January 3, 1994, Father's petition to intervene was allowed. An order was entered in the state of Florida adjudicating Father to be the natural father of Son on June 6, 1994. On June 7, 1994, the Mixes filed an amended petition for adoption in part to change Son's name to Charles Alan Mix from the present name of Chad Alan Andolino. On September 15, 1994, Father's motion to dismiss the adoption was denied. Thereafter, on October 18, 1994, the Mixes filed a petition for a home study of Father on the claims that he did not earn enough money or have a proper home in which to raise Son. On February 20, 1995, the Mixes filed a petition for custody. Subsequently, on March 13, 1995, the trial court issued its order denying the Mixes petition for adoption. The trial court found that

> The evidence in this case does not rise to the level of clear and convincing proof of the father's intent to abandon his child, especially considering that all legitimately controverted facts are to be resolved in favor of the father.

In determining that the evidence of abandonment was not clear and convincing proof, the court stated:

> Up until two months prior to the birth of the child, the father

4

resided with the mother and contributed support to the household. A protective order prohibited the father from contacting the mother between the dates of the parent's separation in March and the birth of the child in May. . .[u]pon learning of the approximate date of the child's birth, the father made efforts to locate the mother and child. After discovering the child had been placed for adoption, the father proceeded to file custody proceedings in Florida seeking custody of his child. In conclusion, the Court finds that the legal standard for abandonment in adoption cases has not been met.

A petition for transfer of custody and for a temporary restraining order were filed by Father on May 26, 1995. Thereafter, Lorena Mix absconded with Son. On June 20, 1995, the trial court ordered that Son be turned over to the Department of Human Services. On July 3, 1995, Father filed an answer to the petition for custody. A motion for stay of temporary custody order pending final custody determination was filed by the Mixes on August 17, 1995. The trial court granted an additional fifteen days from October 5, 1995, to perfect an interlocutory appeal of the dismissal of the Mixes' petition for adoption. The Mixes filed their notice of appeal on October 12, 1995.

By an order dated October 24, 1995, this Court remanded the case to the trial court for a hearing to determine Father's fitness and ability to take care of Son. The hearing was conducted on December 1, 1995. By an order entered January 19, 1996, the trial court found that Father had married, that Father and his wife had a stable home environment, and that Father and his wife resided in appropriate physical facilities within which to rear Son. However, the trial court further found that Father stayed away from home after his regular work hours and spent that time involved in illegal drugs or frequenting places where drugs were easily obtainable. The trial court concluded that Father could not provide a stable home environment for Son and would not be an appropriate person to have custody of Son. As it stands now, the Mixes have custody of Son, but have been denied the right to adopt him. Father's parental rights are still intact. This appeal ensued.

The Mixes appealed, challenging the order of the trial court finding that Father had not abandoned Son and, thereby, dismissing their petition for adoption.

**Discussion**

Inasmuch as this case was tried by the court below sitting without a jury, this court's review on appeal is governed by Tennessee Rule of Appellate Procedure 13(d), which directs us to review the case de novo. Roberts v. Robertson County Bd. of Educ., 692 S.W.2d 863, 865 (Tenn. Ct. App. 1985); Haverlah v. Memphis Aviation, Inc., 674 S.W.2d 297, 300 (Tenn. Ct. App. 1984); T.R.A.P. 13(d). In conducting a de novo review of the record below, however, this court must presume that the trial court's findings of fact are correct. Under this standard of review, we must affirm the trial court's decision unless the trial court committed an error of law affecting the result or unless the evidence preponderates against the trial court's findings. Roberts, 692 S.W.2d at 865. In this regard, when a conflict in testimony requires the trial court to make a determination regarding the credibility of a witness or witnesses, such a determination is binding on the appellate court unless other real evidence compels a contrary conclusion. Hudson v. Capps, 651 S.W.2d 243, 246 (Tenn. Ct. App. 1983).

Parents, including parents of children born out of wedlock, have a fundamental liberty interest in the care and custody of their children under both the United States and Tennessee Constitutions. Stanley v. Illinois, 405 U.S. 645 (1982); Nale v. Robertson, 871 S.W.2d 674, 678 (Tenn. 1994). These parental rights are primary and superior above all others and continue unless the parent consents, relinquishes them, abandons his or her child, or forfeits his or her parental rights by some conduct that is not in the best interest of the child as provided in T.C.A. § 37-1-147(b)(c)(d)(1) - (6). Indeed, we recognize that adoption proceedings profoundly affect not only the rights of the natural parents but also the rights of the child and the adoptive parents. When an adoption is granted, the natural parents are reduced to the role of complete strangers and have no rights, parental, visitation or other insofar as the child is concerned. Grider v. Grider, 187 S.W.2d 613, 614 (Tenn. Ct. App. 1945). At this time, the granting of a petition for adoption establishes from that date a relationship of parent and child between the adoptive parents and the adopted child as if the adopted child had been born to the adoptive parents in lawful wedlock. In Re Adoption of Dearing, 572 S.W.2d 929, 932 (Tenn. Ct. App. 1978).

6

At the time this case came to trial, Tennessee lacked a uniform standard for determining whether a parent has abandoned his or her child.[1] We should note that, according to its express provisions, the definition of "abandoned child," in the version of T.C.A. § 36-1-102(1)(A) applicable at the time of this case, relates to cases where there is an "action or proceeding to declare the child to be an abandoned child." At the time of this case, this had not been extended by amendment or construction to apply when the issue of abandonment is under consideration in an adoption proceeding in the circuit or chancery court. See In Re Adoption of Parsons, 766 S.W.2d 196, 200 (Tenn. Ct. App. 1988). Thus, the trial court is not limited by the definition of an abandoned child found in T.C.A. § 36-1-102(1)(A) (1991 Supp.). Ex Parte Wolfenden, 349 S.W.2d 713, 714 (Tenn. Ct. App. 1959).

The Tennessee Supreme Court has articulated the standards for determining abandonment in adoption proceedings as follows:

> Abandonment, as it pertains to an adoption proceeding,[2] imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. . .

In re Adoption of Bowling, 631 S.W.2d 386, 389 (Tenn. 1982)(quoting Ex parte Wolfenden, 349 S.W.2d 713, 714 (Tenn. Ct. App. 1959)); See also In re Adoption of Female Child (Bond v. McKenzie), 896 S.W.2d 546, 547 (Tenn. 1995). This Court has held that:

> The evidence of abandonment must show a "conscious

_____

[1] A special legislative committee studied Tennessee's adoption laws. See S.J.Res. 17, 98th Gen. Assembly, 1st Sess., 1993 Tenn. Pub. Acts 1050. The committee introduced legislation in the Ninety-Ninth General Assembly that replaced the existing standards with a single standard. See S. 653/H. 406, 99th Gen. Assembly, 1st Sess., § [1], 36-1-102(1), at 3-6 (1995). This adoption standard was codified at T.C.A. Title 36 Chapter 1 Parts 1 and 2 and became effective January 1, 1996. The definition of "abandoned child" applicable when this case came to trial was as follows:
> "Abandoned child" means: A child whose parents have willfully failed to visit or have willfully failed to support or make reasonable payments toward such child's support for four (4) consecutive months immediately preceding the institution of an action or proceeding to declare the child to be an abandoned child. T.C.A. § 36-1-102 (1)(A) (1991 Supp.).

[2] As a matter of law, we note that at the time of this case there was a distinction in the law between cases where an abandonment is asked to be declared and those cases where not only is there an abandonment request, but also an adoption of the abandoned child. In 1995, the former situation was controlled by a statutory definition of "abandoned child" in T.C.A. § 36-1-102(1)(A) (1991 Supp.). In the latter situation, case law sets the precedent concerning the definition of "abandoned child." The new version of the adoption statute, codified at T.C.A. Title 36, Chapter 1, Parts 1 and 2, encompasses both situations. However, the events of this case took place before this statute was enacted on January 1, 1996.

> disregard or indifference" for parental obligations and must demonstrate that there has been an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relationship and throw off all obligations growing out of the same.

Francher v. Mann, 432 S.W.2d 63, 65 (Tenn. Ct. App. 1968).  Accordingly, we concluded that the conduct must amount to "an absolute, complete and intentional relinquishment of all parental control and interest . . . [in] the child" in order to constitute abandonment. Francher, 432 S.W.2d at 66.

As mentioned above, a natural parents rights are given a position of priority and superiority over all others.  The heightened burden of proof charged upon those seeking a declaration of abandonment in an adoption proceeding is another safeguard against a wrongful termination of these parental rights.  Unlike most other civil cases requiring proof by a preponderance of the evidence, adoption cases mandate the party asserting that a parent has abandoned his or her child prove their case by clear and convincing evidence. In re Adoption of a Female Child, 896 S.W.2d at 547; Koivu v. Irwin, 721 S.W.2d at 807.

The "clear and convincing evidence" standard defies precise definition.  Majors v. Smith, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989).  While it is more precise than the preponderance of the evidence standard, Rentenbach Engineering Co. V. General Realty Ltd., 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the "beyond a reasonable doubt" standard.  Brandon v. Wright, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992).  Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness or the conclusions to be drawn from the evidence.  See Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992).  It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.  Brandon v. Wright, 838 S.W.2d at 536; In re Estate of Armstrong, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993).

The evidence in this record does not qualify by the foregoing standard.

8

Courts have consistently used the standards set forth in Ex parte Wolfenden and

Francher v. Mann to determine whether a parent has abandoned his or her child.[3] These

decisions illustrate that the courts consider the following matters when ascertaining

whether an abandonment has occurred or not:

> (1) The parent's ability to support the child; (2) the amount of
> support the parent has provided to the child; (3) the extent and
> nature of the contact between the parent and the child; (4) the
> frequency of gifts on special occasions; (5) whether the parent
> voluntarily relinquished custody of the child; (6) the length of
> time the child has been separated from the parent; and (7) the
> home environment and conduct of the parent prior to or in lieu
> of any actual removal of the child to another.

Koivu v. Irwin, 721 S.W.2d 803, 807 (Tenn. Ct. App. 1986). No single factor is controlling.

O'Daniel v. Messier, 905 S.W.2d 182, 187 (Tenn. Ct. App. 1995). Abandonment inquiries

are heavily fact-oriented, so the courts may consider any fact that assists in deciding

whether the parent's conduct demonstrates a conscious disregard of all of his or her

parental responsibilities. Id. We feel that it is important to note that abandonment by

natural parents may be found only when, being given benefit of every controverted fact,

such inference follows from the evidence as a matter of law. Ex parte Wolfenden, 348

S.W.2d at 756-757.

Turning to the factors articulated in Koivu, we agree with the trial court's findings that

Father never abandoned Son. Regarding factor (1), Father has remarried, has regular

employment with a radio station and as a musician, and has a stable home environment

with his present wife. Factor (2) is a controverted fact, and as such, Father should be

given the benefit of this fact. Father testified that Mother and he "split the bills."

Additionally, Father testified that he attempted to send clothes and toys to Son, but the

Mixes would not allow him to do so. The Mixes admit to denying Father any right to see

Son or assert his rights as a parent. Concerning factors (3), (4), and (6), as mentioned

above, the Mixes have denied Father any right to see Son or to assert any of his rights as

a parent; therefore, any efforts of Father were futile. Father requested visitation, but has

---

[3]Pierce v. Bechtold, 448 S.W.2d 425 (Tenn. Ct. App. 1968); In re Adoption of Female Child (Bond v. McKenzie), 896 S.W.2d at 547 (Tenn. 1995); In re Adoption of Parsons, 766 S.W.2d 196 (Tenn. Ct. App. 1988); In re Adoption of Self, 836 S.W. 581 (Tenn. Ct. App. 1992); In re Rigsby, App. No. 01-A-01-9304-CV-00171, slip op. at 10.

not been granted such by the Mixes. Father's offers to send clothes and toys were emphatically denied by the Mixes. Factor (5) is illustrated in that Father has refused to surrender his rights after repeated request to do so by Mother. Upon learning of the approximate date of Son's birth, Father made efforts to locate Mother and Son. After discovering that Son had been placed for adoption, Father filed custody proceedings in Florida. Concerning factor (7), the conduct and home environment of Father in lieu of actual removal of Son to the Mixes was stable in that Father had remarried, was employed full time, and according to his testimony, did not presently partake of drugs and only occasionally drank beer. In fact, the trial court found that Father and his new wife presented a stable home environment for a child.

We recognize that the evidence concerning many of these factors was disputed at trial. The trial court, however, was in a position to evaluate the credibility of the witnesses at the hearing, and the court apparently resolved this dispute in favor of Father. We agree.

We feel that it is necessary to note the gravity and difficulty in this matter. Undoubtedly, certain children would be better off without the presence of one parent or the other in their lives, but that is not, and has never been a basis to grant a petition for adoption. This is an adoption proceeding not a custody determination. As this court quoted in Ex parte Wolfenden, "The rights of the parties and authority of the court in an adoption proceeding differs greatly from those in a chancery action involving mere custody, for adoption affects the course of inheritance, severing forever and conclusively the legal rights and interests of the natural parents, while custody is only a change into another relationship on a temporary basis." Ex parte Wolfenden, 348 S.W.2d at 757.

We agree that it is one thing to say that a parent's actions have been of such a nature as to remove a child from the parent's home, but it is quite another thing to say that a parent's actions have gone so far as to decree that "the child is no longer your child."

Based on the evidence in this record, giving Father the benefit of every controverted

10

fact, there is no clear and convincing evidence that Father abandoned Son and the evidence does not preponderate against the findings of the trial court. We hereby affirm the judgment of the trial court dismissing the Mixes petition for adoption.[4]

## Conclusion

Based on the foregoing analysis, we affirm the trial court's finding that Father had not abandoned Son, and that it would not be in Son's best interests to terminate Father's parental rights. We further affirm the dismissal of the Mixes' petition for adoption. This

case is remanded to the trial court for such other and further proceedings as may be necessary and consistent with this opinion. Costs are taxed to the appellants, for which execution may issue if necessary.

_____
HIGHERS, J.

CONCUR:

_____
FARMER, J.

_____

[4]In light of our affirmance of the judgment of the trial court, we decline to address the issue of whether the appellants perpetrated fraud by stating in their petition for adoption and in their amended petition for adoption that the father of the child in question was unknown. Although appellee properly raised this issue, it has become moot.

11

_____
HAYES, J.