**In the Matter of Jimmicia Leshea GORDON, A Minor, Under the Age of Eighteen Years.**

**Oltra Travese WEBB, Plaintiff/Appellant,**

v.

**Elizabeth WILSON, Defendant/Appellee.**

Court of Appeals of Tennessee, Western Section, at Knoxville.

March 5, 1998.

Application for Permission to Appeal Denied by Supreme Court Oct. 5, 1998.

John M. Foley, Foley, Bowers & Bell, Knoxville, Tennessee, for plaintiff.

Timothy P. Coode, Knoxville, Tennessee, for defendant.

FARMER, Judge.

Oltra Travese Webb (Mother) appeals from the order of the chancellor terminating her parental rights in her minor daughter Jimmicia Leshea Gordon.

It is undisputed that Jimmicia is the child of Mother and Jimmie Lee Gordon (Father), who never married. This litigation began in March 1994 when Father filed a petition for legitimation and custody of Jimmicia in the Chancery Court for Knox County. The petition averred that Mother's whereabouts were then unknown and that she had left the minor child with Father, had not contacted him since her departure nor attempted to have any contact with the child. In response, Mother entered into an agreed order which was entered by the trial court and provided that it was agreed that it was in the child's best interest for Father to have custody and legitimating the child. No provision was made for visitation by Mother or for the payment by her of support. The order was entered May 31, 1994.

Father was killed in October 1994. That same month, Mother brought a petition for change of custody averring that she had been advised by Elizabeth Wilson, the mother of Father, that the child was living with a paternal aunt in Texas and praying that the child be returned to the jurisdiction of the court in Knox County. Elizabeth Wilson (Grandmother) answered the petition denying that Mother was a fit and proper person to have custody of Jimmicia, admitting that the child was currently residing in Texas and counterpetitioned alleging that Mother had abandoned the child and that custody should be granted to Elizabeth Wilson, the paternal grandmother. Mother then filed a motion to establish visitation. All matters pending at that time were heard March 9, 1995.

■■■■ The statement of evidence reveals that during the spring or summer of 1993 Mother left Jimmicia and her other child (not the child of Gordon) in her apartment unattended.[1] At that time Jimmicia would have been less than one year old. The police were notified and Father and grandmother went to the apartment and took Jimmicia. The custody agreement recited above resulted. It appears from the record that, although legal custody was granted to Gordon, both he and his mother, primarily his mother, had the actual care and custody of Jimmicia. Grandmother testified that once the child was taken from the apartment, Mother never came to visit the child, never called and never offered any support. She and Father supported the child, placed the child in day care and provided for its medical needs. In the fall of 1994 when Grandmother required surgery and was unable to look after Jimmicia, Father took her to stay with his aunt in Texas. Following this hearing, the chancellor found that Mother had abandoned the child. The chancellor found that following the agreed order of custody, Father and grandmother provided a home for the child. Mother did not visit or call upon the child nor did she provide any money for the support of the child, although she was receiving AFDC support payments for the child. The chancellor noted in his memorandum opinion

that grandmother supported her claim of abandonment by her testimony that Mother failed to visit or make any contact with the child for a period of six to eight months while the child was living with Father and grandmother and a failure to provide support. Mother, on the other hand, testified that she did have some visitation while Jimmicia was in the custody of Father and grandmother. It is apparent that the trial court simply did not believe Mother. The chancellor noted that there was very convincing evidence that Mother received AFDC support payments for the child, kept the money for herself rather than contributing for the support of the child. He concluded that the evidence clearly, cogently and convincingly established abandonment. He next considered whether the evidence established a repentance of the abandonment and found that the only evidence was that, after Father was killed, Mother asked that the child be returned to her and brought the petition for change of custody. This was found to be insufficient to establish repentance of the abandonment. Having found abandonment, the court also found that the grandmother, Elizabeth Wilson, to be a fit and proper person to have custody of the child.

Abandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. It does not follow that the purpose may not be repented of, and, in proper cases all parental rights again acquired ... but when abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child.

*Ex Parte Wolfenden,* 48 Tenn.App. 433, 441, 348, S.W.2d 751, 755 (1961) (citations omitted). This Court has stated that the conduct must amount to an " 'absolute, complete and intentional relinquishment of all, parental control and interest ... [in] the child' in order to constitute abandonment." *O'Daniel v. Messier,* 905 S.W.2d

---

1. The record does not reveal the age of the other child, JoQuan. However, it does refer to that child as being "also a young child" and Jimmi-

cia's "small brother." There is no evidence that that child was old enough to be responsible for the care of Jimmicia during Mother's absence.

182, 187 (Tenn.App.1995) (quoting *Fancher v. Mann,* 58 Tenn.App. 471, 478, 432 S.W.2d 63, 66 (1968)). The evidence of abandonment must show "an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relationship and throw off all obligations growing out of the same. *O'Daniel,* 905 S.W.2d at 187 (Tenn.App. 1995) (quoting *Fancher v. Mann,* 58 Tenn. App. 471, 476, 432 S.W.2d 63, 65 (1968)). Abandonment must be proven by clear and convincing evidence. *O'Daniel,* 905 S.W.2d at 187. When considering whether an abandonment exists, courts do not look at protestations of affections and intentions expressed by the natural parents, but look at the past course of conduct. *Koivu v. Irwin,* 721 S.W.2d 803, 807 (Tenn.App. 1986). Abandonment by natural parents may be found only when, being given benefit of every controverted fact, such inference follows from the evidence as a matter of law. *Ex Parte Wolfenden,* 48 Tenn.App. at 444, 348 S.W.2d at 756.

*In re Adoption of Thompson v. Montieth,* 943 S.W.2d 393, 395 (Tenn.App.1996).

■ It has been established in this jurisdiction that, in a contest between a parent and a non-parent, the parent cannot be deprived of custody of the child unless there has been a finding of substantial harm to the child. Only then may a court make a "best interest of the child" evaluation in making a determination of custody. *In re Adoption of Female Child,* 896 S.W.2d 546 (Tenn.1995); *see also Hawk v. Hawk,* 855 S.W.2d 573 (Tenn.1993). While the trial court did not make a specific finding, it is implicit within his findings that Mother's conduct in leaving a baby unattended constituted substantial harm.

■ The fact that Mother voluntarily surrendered custody to Father does not, in and of itself, constitute abandonment. However, our review of the evidence convinces us that the chancellor was correct in determining that Mother did abandon Jimmicia and the evidence was clear and convincing. Mother admitted that she made no contribution toward the support of Jimmicia. While Mother testified that she did exercise some visitation

subsequent to surrendering custody, the trial court did not credit her testimony and the chancellor, having the opportunity to observe the witness, is in a better position than this Court to determine her credibility.

Mother filed a petition asking the chancellor to reconsider his finding of abandonment and award custody. Elizabeth Wilson, the paternal grandmother, then filed a motion for termination of parental rights. A further hearing was conducted on September 6, 1996. Following the hearing, the chancellor ordered that the parental rights of Mother be terminated. As stated in Appellant's brief, this is the crux of this appeal.

Chancery courts have concurrent jurisdiction with juvenile and circuit courts to terminate parental rights pursuant to the provisions of Title 36, ch. 1, part 1. T.C.A. § 37–1–104(c). T.C.A. § 36–1–113 provides:

**Termination of parental rights.**—(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1, and title 37, chapter 2, part 4.

. . . .

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

At the time Grandmother filed to terminate Mother's parental rights on May 25, 1995, T.C.A. § 37–1–102(b)(1) provided:

"Abandoned child" means a child whose parents have willfully failed to visit or have willfully failed to support or make reasonable payments toward his support for four (4) consecutive months immediately preceding institution of an action or proceed-

ing to declare the child to be an abandoned child.[2]

The hearing on termination of parental rights was held September 6, 1996 at which time the trial court announced that it would consider all the testimony heretofore given in this case. At that hearing, Mother admitted to leaving the children alone in the apartment while they were asleep. When she returned, the children were crying, the police had been called and Gordon took Jimmicia with him. She admitted signing the petition to change custody but testified that she did have visitation, specifically from May of 1994 to July 1994. She further testified that she was aware that Gordon was taking Jimmicia to Texas due to his mother's surgery but asked him not to do so until after the other child's birthday. When she learned of Father's death, she began attempts to regain custody of her daughter. Following Father's death, grandmother refused to let Mother have the child. Mother further testified that she never had any spare money to spend on Jimmicia after Father gained custody as her AFDC payments for that child ceased. However, when questioned on cross-examination, she was asked whether she admitted previously testifying that she was receiving AFDC payments while she was in Nashville to which she responded "no, she did not recall." She also testified that she did not recall previously testifying that she had a job in Nashville while she was receiving AFDC payments, yet still paid no support. When asked if she recalled that she had no contact with Jimmicia while she was in Nashville, her response was that she did not talk to Jimmicia while she was in Nashville. She did admit that she knew where Jimmicia was in day care in Nashville. She testified that, since Father and grandmother had custody of Jimmicia, they should take care of her.

Grandmother testified that during the period Father had legal custody, the child actually stayed with her until she was taken to Texas. She testified that she did refuse to turn the child over to Mother after Jimmy was killed but the first time she saw Mother since the change of custody was at Father's funeral. She had testified previously that

from the time Father gained custody, Mother never came to visit the child, never called and never offered any support whatsoever.

At the time the motion to terminate parental rights was filed, T.C.A. § 37–1–104(c) provided that "[t]he juvenile court has concurrent jurisdiction with the circuit and chancery courts in proceedings to terminate parental rights pursuant to § 37–1–147, or in cases where a child has been abandoned as defined by § 37–1–102(b)(1)." Upon completion of the September 6, 1996 hearing, the chancellor entered an order terminating the parental rights of Mother, denying Mother's motion to require the child to be returned to court's jurisdiction to allow her to pursue her visitation rights, denying Mother's motion to appoint adversary legal counsel for the child, denying Mother's motion to establish visitation of the child and denying Mother's motion to dismiss grandmother's motion for termination of parental rights. The order further provided that Texas is now the child's home state and that the trial court would exercise no further jurisdiction on issues concerning the child. Mother appealed and presented the following issues:

I. Did the chancellor err in refusing to sustain the motion of Appellant to dismiss the motion of Elizabeth Wilson for termination of parental rights?

II. Did the chancellor err in refusing to sustain the motion of Appellant to require Appellee to get the child returned from Texas to Tennessee so that the mother could establish visitation rights?

III. Did the chancellor err in failing to sustain Appellant's motion to appoint adversary legal counsel for the minor child?

IV. Did the chancellor err in granting the motion of appellee, Elizabeth Wilson, terminating parental rights of Oltra Webb to the minor child, Jimmicia Gordon?

V. Did the chancellor err in ruling that Texas is now the child's home state, and that the Tennessee court has no further jurisdiction on issues concerning the child?

Our review of this matter is *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court.

---

**2.** This section was deleted by 1995 amendment effective January 1, 1996.

Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

■ In support of the first issue, Mother argues that no petition for termination of her parental rights was filed and no process was issued or served upon her, thus depriving her of due process. At the time grandmother filed for termination of Mother's parental rights, there was pending before the court Mother's motion to establish visitation. Mother was represented by counsel and the pleadings seeking termination of parental rights was served upon her counsel. Although titled "Motion" rather than "Petition" for termination of parental rights, it is clear from the body of the motion that grandmother was asking the court to terminate Mother's parental rights in the child. We do not find a deprivation of due process. Mother further argues that the trial court erred in considering evidence presented at the custody hearing in adjudicating the termination of parental rights. After reviewing the statement of the evidence, it appears that the evidence presented at the termination hearing was not only repetitious of that presented at the custody hearing but also much more detailed. We find this issue to be without merit.

■ Mother next contends that the trial court erred in failing to grant her motion to require grandmother to have the child returned from Texas to Knox County, Tennessee. At the time that motion was filed, the motion for termination of parental rights was pending and we do not find that the chancellor abused his discretion in denying that motion. In denying Mother's motion for visitation, the trial court noted that that request was rendered largely moot by reason of the termination of parental rights. The court further noted:

> However, in any event whether the child should be returned here should be left to those who have provided a home and care for the child. Respondent and her sister. One of the reasons the child was taken to Texas to be cared for was Petitioner's abandonment. The child has been there now for some two years. The child is being provided a good and loving home in

Texas, and that situation should not be disrupted by a court order entered with so little evidentiary support as has been presented in this case. The evidence, however viewed, does not justify returning the child from Texas.

■ Mother next contends that the chancellor erred in failing to sustain her motion to appoint adversary legal counsel for the child. She relies upon the following portion of T.C.A. § 37–1–149(a):

> **Guardian ad item—Special advocate— Appointment.**—(a) The court at any stage of a proceeding under this part, on application of a party or on its own motion, shall appoint a guardian ad litem for a child who is a party to the proceeding if such child has no parent, guardian or custodian appearing on such child's behalf or such parent's, guardian's or custodian's interests conflict with the child's or in any other case in which the interests of the child require a guardian.

In this case, the child had both a parent and a custodian appearing on the child's behalf and we find no abuse of discretion on the part of the trial court in denying this motion.

Mother further relies upon *Winterroth v. Winterroth,* No. 03A01–9506–CH–00182, 1995 WL 689735, —— S.W.2d —— (Tenn. App. Nov. 22, 1995). In that case, two and one-half years following the entry of the divorce decree, the trial court entered an "Agreed Order of Termination of Parental Rights" whereby mother gave up her parental rights to her children. She subsequently filed a motion under Rule 60.02 T.R.C.P. to set aside the agreed order. The eastern section of this Court vacated the trial court's agreed order finding that it lacked subject matter jurisdiction under the circumstances. The court noted that no petition was filed by anyone seeking a termination of parental rights. We find that cases distinguishable from the instant case.

We find that the evidence as heretofore recited does not preponderate against the trial court's findings that there is clear and cogent evidence sufficient to support abandonment. The elements of abandonment are present and the evidence further supports

the fact that Mother failed to exercise visitation and offer support for the child.

The order terminating Mother's parental rights states that "Texas is now the child's home state and this Court will exercise no further jurisdiction on issues concerning the child." Mother contends that Father, the custodial parent at the time, transported the child to Texas approximately three weeks before he was killed. Less than a month later, Mother filed a petition to regain custody. Therefore, she contends Tennessee was the child's home state within six months of the date of filing of Petition for Change of Custody. However, we do not deem it necessary to address that issue at this point as there may or may not be further proceedings and this issue is therefore pretermitted.

The judgment of the trial court is affirmed. Costs of this cause are taxed to the appellant.

CRAWFORD, P.J., W.S., and LILLARD, J., concur.